## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Lubavitch of Cambridge, Inc. | **COMPLAINT** |
| **Plaintiff,** | |
| | **JURY TRIAL DEMANDED** |
| v. | |
| Cambridge Board of Zoning Appeal and City of Cambridge | |
| **Defendants.** | |

Plaintiff Lubavitch of Cambridge, Inc. for its complaint against the Cambridge Board of Zoning Appeal ("BZA") and the City of Cambridge ("City," together with BZA, "Defendants") alleges as follows:

## INTRODUCTION

1.      Plaintiff Lubavitch of Cambridge, Inc. ("Plaintiff" or "Chabad") is a nonprofit religious corporation that operates a "Chabad"—a religious institution that hosts services, Shabbat dinners, and other religious programs for its congregants and the Cambridge Jewish community. Earlier this year, Chabad applied for a zoning variance to build a fully-functional religious center in Cambridge, Massachusetts. Defendants are the local zoning authority with jurisdiction over the application and the municipality in which the local zoning authority operates.

2.      This case arises from Defendants' blatantly unlawful, unreasonable, and discriminatory denial of that application.

3.      As Defendants were made aware, the renovations that Chabad proposed and sought to have approved were absolutely necessary for it to serve its congregants

and carry out its religious mission. Chabad owns three buildings in adjacent lots in Cambridge on Banks Street; but each building, individually, is far too small to host its whole congregation and offer a full panoply of religious services. Without a full-sized and fully-functional religious center, Chabad has had to host services and meals outside, under a tent, even in the rain and in the freezing cold Boston winters.

4.    This problem could easily have been remedied with the renovations that Chabad proposed, in which it would build a connection between two of its three buildings, and with a Floor Area Ratio ("FAR") variance that Defendants routinely grant to similarly-situated applicants, both religious and non-religious. Chabad communicated as much to Defendants. So did several proponents of the application, who explained that the current facilities are too small, that congregants cannot worship together, and that having a thriving religious center for Jews in Cambridge is imperative, especially now, when Jewish institutional presence is "sparse" in the area and antisemitism is exploding.

5.    But the opponents were also vocal. They claimed that Chabad's proposal for a fully-functional Jewish institution in the neighborhood would cause a "nuisance," that Chabad was greedily asking for a "handout," and that it simply should go elsewhere. One group engaged lawyers and PR consultants to cleanse its submissions of any overt signs of discriminatory intent; but the content of their messages and the intensity of their opposition made their true motivation clear.

6.    In denying Chabad's application, BZA and, specifically, the two BZA members who voted "no," turned a blind eye to the needs of the Cambridge Jewish

community. These individuals willfully disregarded Chabad's civil rights, even openly conceding that they were not "equipped" to apply their clear statutory and constitutional obligations. Not only did they succumb to anti-religious opposition from Chabad's opponents, their statements on the record reveal their personal discriminatory intent.

7. Indeed, two BZA members rigged the administrative process to ensure that Plaintiff's application would never be granted. Their scheme was simple: Knowing that only two opposing votes were required to tank Chabad's application, BZA Chairman Jim Monteverde and BZA Associate Member Carol Agate—a vocal opponent of Chabad's application—ensured that Ms. Agate would sit (and therefore vote) on Chabad's case. Of the 11 cases heard at the May 9 and June 20 sessions, Ms. Agate sat for only **one** of them—Chabad's. And in order to sit, Ms. Agate actually replaced one of the members of the hearing's panel. No explanation was provided for this mysterious substitution.

8. Defendants' scheme worked perfectly. Despite three BZA members, *a majority of the panel*, concluding that Chabad's plans would benefit to the community and should have been afforded deference as required by federal civil rights laws, Chairman Montverde and Ms. Agate disregarded Chabad's warnings and the apparent but hidden legal advice of City lawyers and voted against Chabad's proposal. Needing four of five votes, Chabad's application was denied as a *fait accompli*.

9.     When Congress enacted the Religious Land Use And Institutionalized Persons Act ("RLUIPA") in 2000, it implemented powerful protections against discriminatory application of zoning laws, such as the discriminatory denial perpetrated by Defendants. Local zoning authorities are not above federal law. Defendants had a clear duty to consider Chabad's civil rights under RLUIPA, yet two of its members brazenly refused to do so. Defendants are in clear violation of RLUIPA, as they have substantially burdened Chabad and its congregants' religious practice, treated Chabad differently from both religious and non-religious institutions, and effectively excluded Judaism from the neighborhood. By discriminating against Judaism and restricting Chabad's religious rights, Defendants have also violated the U.S. and Massachusetts Constitutions, and other civil rights laws.

10.     This Complaint seeks injunctive relief and recompense for Defendants' civil rights violations and restraints on Chabad's religious freedom.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Counts I–V in this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because these claims arise under federal law and RLUIPA, an Act of Congress providing for the protection of civil rights. This Court has supplemental jurisdiction over Counts VI–VII under 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over Defendants Cambridge Board of Zoning Appeal and City of Cambridge because they are local governmental entities in Massachusetts.

13.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1), (b)(2) because Defendants are located in the District of Massachusetts, and a substantial part of the events or omissions giving rise to the claims occurred in the District.

## PARTIES

### A. Plaintiff

14.     The Chabad movement is a worldwide religious and educational movement that spreads Jewish awareness to all Jews, both men and women, young and old. In its work to engage with college and university students, the Chabad movement has established centers on college and university campuses around the country. These centers provide Jewish students with a communal place to gather, eat kosher food, worship, and celebrate holidays.

15.     Plaintiff Lubavitch of Cambridge, Inc. ("Chabad"[1]), is a nonprofit religious corporation that operates a Chabad house—a religious center that holds religious services, Shabbat dinners, and other religious and Jewish cultural programs for its congregants and the broader Jewish community.

16.     Since September of 1997, Chabad has helped provide Jewish students at Harvard and countless others in the Cambridge community with a home for their social, cultural, and spiritual needs, and it offers Shabbat and holiday meals free of

---

[1] Plaintiff Lubavitch of Cambridge, Inc. is often referred to as "Harvard Chabad" because of the many religious services they provide for Harvard students, and their other congregants. Hundreds of Harvard students, past and present, have found a spiritual and social home at Chabad. Chabad is neither owned nor operated by Harvard University.

charge to students. Chabad is a place for all, regardless of their affiliation or degree of observance.

17.     Despite its humble beginnings, Chabad is now one of the largest Chabad operations in the United States.

18.     Rabbi Hirschy Zarchi is the founder and president of Chabad and serves as Jewish Chaplain to thousands of Harvard students and alumni.

**B. Defendants**

19.     Defendant Cambridge Board of Zoning Appeal ("BZA") is a quasi-judicial body that conducts public hearings on all applications and appeals before it, and issues decisions. The BZA is comprised of five members and up to seven associate members.

20.     Defendant City of Cambridge is a duly incorporated municipality existing under the laws of the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

**A. Chabad Establishes in Cambridge in September of 1997**

21.     Rabbi Hirschy Zarchi and his wife, Elkie Zarchi, moved into 38-40 Banks Street in Cambridge in January of 1999, residing in one of the two units on the lot. They established their home as a Chabad house, in the tradition of their Jewish faith.

22.     In January of 2000, Chabad purchased the property located at 38-40 Banks Street, to accommodate the Chabad house and allow the Zarchis to grow their ministry. In November of 2000, Chabad obtained a BZA variance to excavate the basement to create additional living area.

23.    The Zarchis' religious outreach included inviting Jewish students, faculty, and members of the Cambridge community and beyond to join them for Shabbat (religious ceremonial) dinners, Jewish holidays, weekly and daily prayer services, and rabbinical studies.

24.    The first floor unit of the home was dedicated to a small synagogue, convening space, and library, along with the Rabbi's offices. The property's use was from the beginning that of a rectory or parsonage (*i.e.*, as a home for the Rabbi and his family), as well as a religious sanctuary for prayer.

25.    In 2006, as the Zarchi family expanded and needed additional space, Chabad purchased the 54-56 Banks Street property. Chabad obtained a BZA variance to add a bay window, front porch, and modified windows. After the renovations were complete, the Rabbi and his family moved into 54-56 Banks Street, establishing this address as their new rectory and parsonage. Since then, the entirety of 38-40 Banks Street has functioned as both a religious home and center for Jewish life, where Jewish students and community members worship, study, and practice their Jewish faith.

26.    In 2007, Chabad purchased 48 Banks Street, the small home situated between the other Chabad-owned properties.

27.    In 2019, Chabad obtained a BZA special permit to temporarily operate a preschool in 48 Banks Street, until it could obtain a new and larger space. The special permit expired two-years later in 2021. The preschool was relocated elsewhere

and this institutional use was abandoned, after which the space was repurposed for Chabad clergy offices.

**B. Chabad's Need to Expand to Serve its Congregants in Cambridge**

28.    From its humble beginnings in September of 1997, Chabad has grown into one of the largest Chabad houses around the country, serving hundreds of Jewish students and community members on a weekly basis.

29.    Chabad's growth is due in large part to its inclusive, non-judgmental, and warm atmosphere, and its dedication to the Jewish faith. But it also reflects the dearth of synagogues or other Jewish institutions in Cambridge. This absence of a Jewish institutional presence in Cambridge has become all the more stark in the aftermath of October 7, as antisemitism erupted throughout the country and in Cambridge.

**1.    Cambridge: Home to an Abundance of Places of Worship, But Few Synagogues**

30.    At least seventy properties in the City of Cambridge are classified by the City Assessor as having a State Use Code of 960. *See* Ex. A (June 20, 2024, 38-40, 54-56 Banks Street Letter). Code 960 pertains to places of worship such as a Church, Mosque, Synagogue, Temple, etc. *Id.* All but two (97.1%) of these religious institutions are located in residential districts comparable to Chabad's. *Id.*

31.    Most of these properties are owned by Christian or Catholic organizations, whereas relatively few are owned by non-Christian/non-Catholic

organizations and only two are owned by Jewish organizations other than Chabad. *Id.*[2]

32.     The FAR for these other religious institutions almost always exceeds the maximum FAR for their district. *Id.* Within only a half-mile of Chabad's proposed expansion, Saint Peter's Episcopal Church, located at 844 Massachusetts Ave, has a FAR of 3.37, exceeding the max FAR by 93%. St. Paul's Parish, also within a half mile of Chabad, at 24 Arrow Street, similarly has a FAR of 2.68, exceeding the max FAR by 79%. *Id.*; *see also* Ex. C (FAR Chart – Churches).

33.     Within a mile of Chabad's proposed expansion there are four churches sharing the same applicable zoning district as Chabad (C-1) that all exceed the max FAR by 115-146%. *See id.* Similarly, within two miles of Chabad's site there are another four churches in a C-1 zone all exceeding the max FAR by 63-121%.[3] *Id.*

### 2.     Chabad Cannot Serve Its Community in its Existing Space

34.     To serve the Cambridge Jewish community and undertake its religious mission, Chabad needs a fully-functioning religious center, and particularly one that is within walking distance from areas that Chabad serves. Observant Jews that

---

[2] There are two Hillels in Cambridge, one at Harvard and one at MIT, but the land of both those properties are owned by their respective universities. Ex B (BZA - May 9 2024 Hearing Transcript) at 150:11-16. Hillel is a national network of Jewish student organizations on college campuses. *See About*, Hillel Int'l, https://www.hillel.org/about/ (last visited Sept. 18, 2024). Hillel is generally geared almost exclusively towards college students. Chabad, on the other hand, provides religious programing for young and old alike, including for college students, families with young children, and Cambridge residents of all ages.

[3] This list is not exhaustive of all the churches exceeding the max FAR in residential zones within two miles of Chabad, but rather an enumeration of some churches with a similar or greater FAR to Chabad's proposed expansion project.

follow traditional Jewish law cannot drive on Shabbat or religious holidays, and must walk to synagogue.

35.    Chabad serves its congregants in the Cambridge area by hosting Shabbat dinners and facilitating congregational prayer and the performance of holiday rituals. But Chabad cannot consistently offer a full panoply of religious services for its congregants, because it does not have facilities fully-equipped with a sanctuary large enough for its congregation, a kosher kitchen, and a mikvah (a ritual bath).

36.    Prayer services and ritual dinners are a staple of Chabad's presence in the community. Yet Chabad does not have a room anywhere in its three buildings that is large enough to host services or Shabbat dinners for its current attendees.

37.    Lacking the necessary space, Chabad cannot fit everyone indoors for communal services, and has resorted to hosting dinners and other religious ceremonies in an outdoor tent—even in the freezing cold Boston winter. When Chabad tries to hold programing indoors for smaller groups, even then, attendees are unable to gather in one room and spill out into hallways and other rooms. This impedes religious practice, and prevents the group from communing and praying as one.

38.    As a local PhD student put it: Chabad "is not only a place of worship, but also a place where I have community. It's a home away from home for me. . . . So in the days when I feel I can't take all the hatred and violence that I see around me and on campus, I go to Chabad[.] . . . [I]t is important for us to have a Jewish center

nearby since on Shabbat and holidays, many do not drive. The tent is not a great solution for us for the various reasons that Rabbi Zarchi mentioned. Boston is not known for its great weather, and we sit outside when it's cold and there's also not enough space for everyone. So some[times] we have to sit separately in different areas. And it would be nicer to – if we could all sit together and stay warm." Ex. B (May 9, 2024 BZA Hearing Transcript) at 74:9-75:10.

39.     A recent graduate who frequented Chabad recounted that "it feels quite bottlenecked by the space," that the synagogue is often full, and that there is "not enough space for everybody to sit down, especially on [Shabbos] morning. You can't have more books because there's not space to put in more books . . . [nor] enough space . . . for everyone to eat [either] outside . . . or indoors. . . . [I]t also feels kind of tense when you're out there," exposed to the cold and wind. *Id.* at 79:22-80:15.

40.     A resident of the area described the space as lacking, noting that "the indoor area is just way, way too small" and "not even close to big enough to comfortably accommodate the regular attendees." *Id.* at 88:2-89:11.

41.     Another Cambridge resident noted that the main reason he does not attend Chabad events more often is because of how cold the winter months are which make it difficult for him and his young children to eat outside. *Id.* at 98:13-99:14.

42.     And another resident explained that young families with children who want to attend Chabad are forced outside, even in the cold, wind, rain, and snow. During winter, "services are rushed so the children can go back home and warm up." The lack of space "force[s us] to choose between observing our faith in bad weather,"

which is unsafe for congregants and their children, "or staying home and missing out on our religious community." *Id.* at 101:1-13.

43.     Even the local non-Jewish community has noticed Chabad's unsustainable accommodations and the resulting inequity for Cambridge's Jewish community. For example, Jacqueline Jowett described the jarring contrast between her comfortable indoor services and meals at St. Paul Perish while Chabad's congregants are forced to eat outside in a tent in the dead of winter, stating "[i]t really saddens me that the Jewish community is struggling for more space, and for a meal during winter that they're eating outside under a tent, while we're -- while we have a warm space just down the street at a Catholic church." Ex. E (June 20, 2024 BZA Hearing Transcript) at 55:6-55:22.

### 3.     Chabad Is Needed Now, More Than Ever

44.     While Chabad has been struggling to provide for its congregants in the small space that it has, antisemitism has been exploding around it—especially in the surrounding Cambridge area and on Harvard's campus. The need for a thriving, functional, and safe Jewish space is more urgent now than it has ever been.

45.     Last year in Massachusetts, according to one study, reported cases of verbal harassment of local Jews were up *344%*, while physical assaults have doubled, and vandalism with evidence of antisemitic intent has soared by 70%.[4]

---

[4] Jon Keller, *Antisemitism exploding in Massachusetts says annual audit*, CBS News (April 17, 2024), https://www.cbsnews.com/boston/news/antisemitism-growing-massachusetts/; *see also Mass. saw a nearly 190% rise in antisemitic incidents last year, new report find*, WBUR (April 17, 2024), https://www.wbur.org/news/2024/04/17/antisemitism-rise-massachusetts-new-england

46.     In April of 2024, the Anti-Defamation League ("ADL") also released a report finding that antisemitic incidents in New England were up by 205% in 2023, exceeding national averages by a staggering 140%.[5] In Massachusetts, according to the ADL, there was a 189% increase from 2022, also outpacing the national average. Incidents of harassment increased by 444% (293 incidents in 2023, compared to 66 in 2022), and Massachusetts recorded eight assaults, doubling the number recorded in 2022.[6] Massachusetts recorded the fifth highest number of incidents per state.[7]

47.     In recent years, several violent antisemitic incidents targeted Boston area Chabad communities.

48.     A series of arson attacks targeted Chabad-related institutions in the Boston area in May of 2019. Two attacks targeted the Arlington Chabad Center, and another targeted the Chabad Jewish Center of Needham.[8]

49.     In July of 2021, Chabad Rabbi Shlomo Noginski was stabbed multiple times outside of the Shaloh House, a Jewish Day School in Brighton, Massachusetts.[9]

50.     Across the region there was also a fivefold increase in antisemitic incidents on college campuses (81, up from 15 in 2022).[10]

---

[5] *Antisemitic Incidents in New England Soared 205 percent in 2023*, ADL New England (April 16, 2024), https://newengland.adl.org/news/antisemitic-incidents-in-new-england-soared-205-percent-in-2023/.

[6] *Id.*

[7] *Id.*

[8] Joey Garrison, *'Somebody out there wants to hurt us': 3 arsons at 2 Jewish centers in 1 week rattles Boston suburbs*, USA Today (May 18, 2019), https://www.usatoday.com/story/news/nation/2019/05/18/three-arsons-two-jewish-centers-one-week-rattles-boston-suburbs/3718930002/.

[9] Michael Levenson, *Man Charged With Hate Crimes in Stabbing of Rabbi in Boston*, N.Y. Times (July 8, 2021), https://www.nytimes.com/2021/07/08/us/boston-rabbi-stabbing-charges.html.

[10] *Id.*

51.     Some members of the BZA recognized the very real dangers the current climate presents for Chabad and its congregants. Indeed, BZA Member Steven Ng urged his colleagues to take these concerns into account saying "I do not personally want to be responsible to see God forbid something happens because, you know, you're worried about something just being about the same height as everything around in the neighborhood. So I urge my fellow Board members to really consider that." Ex. D (June 20, 2024 BZA Hearing Transcript) at 88:3-88:8.

52.     Chabad's need for expansion is urgent. Not only is the space necessary for Chabad and its congregants to have unified communal services, Jews all over Cambridge desperately need one place to practice their religion safely, away from the antisemitic environment that surrounds them.

## C. Needing to Expand, Chabad Applies for a Zoning Permit

53.     To serve its congregants and carry out its religious mission, Chabad applied for a variance to allow for a renovation and addition connecting the buildings at 38-40 Banks Street and 48 Banks Street.

54.     Under Chabad's plans, the house at 48 Banks Street would be relocated to the front of the site, and the new Chabad Center would be comprised of two existing houses (38 and 48 Banks Street) with a new connecting building.

55.     These renovations are necessary to alleviate the overflow described above, and to accommodate all of Chabad's congregants indoors, safely. Chabad owns sufficient land between its three properties to accomplish these ends and service its congregants, but it needs to be able to build sufficiently on its property to do so.

56.    Chabad's proposal first underwent thorough review by the Cambridge Historical Commission pursuant to its Demolition Delay Ordinance, Ch. 2.78, Article II of the City Code, because the proposal involved the partial demolition of 38-40 Banks Street and relocation and partial demolition of 48 Banks Street. The Historical Commission held a public hearing on December 7, 2023, and voted to find the buildings at 38-40 and 48 Banks Street to be significant. At a continued public hearing on January 4, 2024, Chabad's proposal received significant support from community members, and some neighbors and commissioners. Many highlighted the value Chabad brings to the community and reinforced the additional public benefit Chabad's project would bring. Others discussed the hardship Chabad and its congregants face in its current accommodations.

57.    At the January 4 hearing, Chabad's proposal was approved with four commissioners voting in favor, two opposed, and one abstention.

58.    In early March of 2024, after receiving the determination letter from the Historical Commission confirming the Commission's approval of the project plans, Chabad applied to the BZA for a variance (for dimensional Gross Floor Area/Floor Area) and special permit (for parking location) to allow for the renovation and addition connecting the buildings at 38-40 Banks Street and 48 Banks Street. FAR variances are routinely granted by the BZA. In fact, FAR for religious institutions located in residential districts "almost always exceed [the] maximum FAR for those districts." Ex. A (June 20, 2024 Letter from S. Rhatigan) at 1. *See supra* ¶¶ 32-33.

59.    Chabad had no plans to renovate the building on 54-56 Banks Street, but it was included in the BZA application since its lot is merged with the neighboring lots due to common ownership. *See* Ex. E (Chabad Application Form, March 11, 2024) at 4.

60.    The matter was designated BZA-261068-2024, and set for a hearing on April 11, 2024. The hearing ultimately took place on May 9, 2024, and then continued on June 20, 2024. *See* Ex. B (May 9, 2024 BZA Hearing Transcript) at 156:8-157:17.

61.    It was at these two hearings that the small but vocal opposition to Chabad's proposal crescendoed, resulting in the discriminatory denial of its application.

### D. Chabad's Application Receives Overwhelming Neighborhood Support Contrasted with Vocal Discriminatory Opposition

62.    Over the course of the two proceedings, many residents and citizens spoke up in favor of the proposed renovations, explaining to the BZA that Chabad's current space was far too small for its religious purposes. The proponents consistently noted that Jews in the community cannot all gather together in a single sanctuary or dining space at Chabad. And many also noted that the dearth of Jewish institutions in the area has been especially troubling in light of historic levels of hostility towards Jews both nationwide and within Cambridge. The proponents explained the following:

- There is a "troubling" rise in antisemitism in the area, and the need for a strong and thriving Chabad is greater than ever. But the current Chabad facilities do not provide sufficient space to accommodate congregants. *See* Ex. F (May 8, 2024 Email from R. Meyerson) at 1.

- Chabad's proposed renovations are necessary to allow more people to experience the warmth of community that Chabad provides. *See* Ex. G (May 7, 2024 Email from J. Shapiro).

- The renovations would benefit the Jewish community and community writ large. *See* Ex. H (May 7, 2024 Email from O. Dahan)

- The options for Jewish communal worship are "notably sparse" in Cambridge, and at Harvard. Chabad's current size limitations hamper its ability to practice its faith and communal traditions. *See* Ex. I (May 7, 2024 Email from A. Kupershmidt) at 1.

- The "space as it currently stands is too small to accommodate the community members who seek to practice there. I recall that during High Holidays, praying attendees would be spilling out of the room, and during Shabbat meals, there was no place where everyone could eat together indoors." Ex. J (May 7, 2024 Email from S. Oster).

- "Cambridge is strangely devoid of places of worship for Jews," but "the current building is too small and inadequate for its current needs." In the past, Chabad has had to host services and dinners in an outdoor tent, even in the winter. The tent is neither safe nor warm for congregants. *See* Ex. K (May 7, 2024 Email from H. Heller).

- Chabad is "one of the few places in Cambridge where I can practice my religious faith." But "the current physical space is too small." Ex. L (May 7, 2024 Email from C. Shachar).

- Chabad's current space is too small, and at the same time, Cambridge is "devoid" of Jewish institutions. *See* Ex. M (May 8, 2024 Email from D. Teten).

- "The need for a larger facility is clear and urgent to accommodate our growing community and enhance our ability to host educational and cultural activities." Ex. N (May 8, 2024 Email from S. Kaplan).

- There are few Jewish community resources and locations like Chabad in the Cambridge area. Ex. O (June 20, 2024 Letter from M. Rothenberg).

63.    At the same time, the opposition to Chabad's proposal has demonstrated an unmistakable discriminatory bias against Chabad.

64.    One unofficial group—which refers to itself as the Kerry Corner Neighborhood Association ("KCNA")—was particularly vocal. Despite now

17

conveniently claiming to support Chabad and seek compromise, KCNA initially tried to have Chabad removed *altogether*. Before adopting its current patronizing rhetoric about "right-sizing," KCNA advanced the frivolous argument that Chabad was operating illegally on Banks Street, and required a use variance (or special permit) to continue operating any religious use. *See* Ex. P (Feb. 28, 2024 Email from O. Ratay) (advising that a question had been raised challenging the Chabad's right to use the property for its religious purposes "as of right," and that a special permit may be required, despite the Chabad's longstanding use over more than two decades).

65.     Chabad's attorney easily refuted these legal inaccuracies and misstatements, nipping KCNA's theory in the bud. *See* Ex. Q (May 1, 2024 Letter from S. Rhatigan). But KCNA's extreme position made its overarching motivation abundantly clear—it wanted to exile Chabad from the neighborhood altogether, not reach some sort of mutually beneficial settlement.

66.     It is not uncommon for antisemitic groups to form and try to impede zoning applications by Jewish groups. A similar group call Citizens United to Protect our Neighborhoods ("CUPON") of Rockland was recently forced to dissolve as a part of a settlement after CUPON conspired with local officials to prevent an Orthodox Jewish school from purchasing property in the area and thereby "change the character" of their community.[11]

---

[11] *See* Joint Status Report, *Ateres Bais Yaakov Academy of Rockland vs. Town of Clarkstown, et al.*, No. 7:20-cv-01399 (S.D.N.Y. May 28, 2024), ECF No. 78.

67.     Despite failing to convince the BZA of its frivolous argument that Chabad's buildings could have no religious use at all, KCNA pressed forward with its aggressive opposition to the renovations. The group sought legal representation and PR consultation, apparently to police the tone of its opposition and prevent inadvertent *overt* expressions of discrimination. Ex. R (Feb. 29, 2024 Email from A. Joslin).

68.     Notwithstanding KCNA's attempts to frame its objections in the genteel language of zoning regulations, KCNA's true motivations were clear: Although Chabad had to serve its congregants in makeshift tents, unprotected from the rain, sleet, snow, and freezing cold of the Boston winter, KCNA was adamant that Chabad and its congregants endured no "hardship," and that Chabad's proposal provided no public good. *Id*. In fact, the organization sought to mitigate the "nuisances already felt" by Chabad's presence. *Id*.

69.     KCNA lodged its "strong objections" to Chabad's application with the BZA, reiterating that Chabad had only a "simple 'need to expand,'" and faced no real hardship. *See* Ex. S (April 5, 2024 Email from A. Joslin) at 1.

70.     In a follow-up communication several months later, KCNA claimed that it hadn't heard from Chabad, despite Chabad's repeated offers to speak with community members. *See* Ex. T (June 17, 2024 Email & Letter from A. Joslin) at 7. And again, KCNA argued that Chabad faced no "hardship," and that the "substantial detriments" of Chabad's expanded presence "are clear." *Id.*

71.     Meanwhile, KCNA continued to press falsifiable arguments in its desperate bid to tank Chabad's proposal. In its June 17, 2024 submission to the Board, KCNA claimed that the Chabad project was built to accommodate 890 congregants, relying on a gross misrepresentation of the actual occupancy and egress capacity for the project. However, according to the testimony of Chabad's architect, "the building is designed to support the current size of congregants and programs. The occupant capacity for the project is designed to support approximately 250-300 occupants who regularly attend the established religious programs, and ceremonies provided by Harvard Chabad. The building is designed to accommodate the required life safety and egress capacity to meet the non-concurrent religious program typical of Jewish culture, religion, and observed holidays of the calendar year." KCNA grossly misrepresented the occupancy numbers with the intent to cause fear and confusion. *Id*.

72.     Other neighbors went even further than KCNA by invoking antisemitic tropes. One person compared Chabad to a "hotel operator or landlord with high occupancy showing up in front of the Board and asking to double their space," and asking for a "gift" from the city. *See* Ex. U (April 8, 2024 Email from A. Jams) at 1. Further evoking the antisemitic specter of the greedy Jewish landlord, the neighbor concluded by arguing that Chabad should simply purchase more property elsewhere, and that it is not entitled to "a $3-4 million handout." *Id*.

73.     Another neighbor claimed that Chabad would "overwhelm the neighborhood," and that it is "time for it to find a more suitable location." Ex. V (June

20, 2024 Email from P. Baumann). Several neighbors echoed KCNA's disproven lie that Chabad sought to accommodate 800 people at a single time. *See, e.g.*, Ex. W (June 17, 2024 Email from W. Stone).

**E. Chabad Puts BZA on Notice of its Civil Rights Obligations**

74.     To the extent that the substantial religious burden on Chabad was not clear from the testimony of the proponents and opponents alike, Chabad and its attorneys submitted a special memorandum of law to the BZA on May 1, 2024, explaining that a denial of the permit variance would be unlawful and in violation of Chabad's civil and religious rights under RLUIPA. *See* Ex. X (Special Memorandum of Law).

75.     The memorandum explained why the modest renovations were necessary for Chabad to practice its religion freely, and why succumbing to vocal, antisemitic opposition would be legally and ethically wrong. *Id.* at 2-3. Chabad explained its rights under RLUIPA, and why and how a denial of the variance would violate RLUIPA by, among other things, substantially burdening Chabad's religious practice. *Id.* at 3-6. Chabad thereby put the BZA and its members on notice of their potential civil rights violation.

76.     BZA staff members indicated that the City's Law Department would analyze Chabad's rights under RLUIPA and advise the BZA members accordingly. Staff further indicated that they would provide Chabad a copy of the Law Department's analysis before the June 20, 2024 hearing.

77.   Chabad never received a copy of the response memorandum. Instead, Chabad's counsel received an email stating, "[t]he Legal Department has advised the Board of Zoning Appeal in an attorney/client confidential communication." Ex. Y (June 20, 2024 Email from O. Ratay).

78.   When Chabad later submitted a public records request, the City identified the Law Department's seven-page response to the BZA's request for legal opinion regarding Chabad's application, but improperly withheld it as privileged. Upon information and belief, the Board was informed of Chabad's legal rights under RLUIPA but chose to ignore those rights because of prejudice and bias. Indeed, after receiving the City's memo three of the five BZA members understood and articulated their obligations under RLUIPA and voted in favor, while the other two members voted against Chabad on the basis of incorrect legal positions put forward by KCNA members.

## F. BZA Chairman Hand-Picks Associate Member to Tank Chabad's Application

79.   Chabad never had a fair hearing for its application. Instead, understanding that they could sink the application with just their two votes, Chairman Jim Monteverde and associate member Carole Agate, upon information and belief, conspired together to ensure Chabad's permit would be denied.

80.   Their scheme was simple: When the time arrived to hear Chabad's application, Chairman Monteverde replaced a sitting member of that day's session with Ms. Agate, who he knew was also opposed to Chabad's proposal. Chabad's

application now perfectly positioned for denial under the BZA's four-of five-vote rule, and Ms. Agate's objective accomplished, Ms. Agate voted to continue the case, and the BZA member whom she replaced promptly "returned" to sit for the rest of the session. Thus, although, the other three sitting members ultimately voted yes at the continued June 20 hearing, it was not enough. The Chair and the Chair's hand-picked replacement were able to block the permit. Upon information and belief, this discriminatory abuse of the administrative process has substantially burdened Chabad's religious practice.

### 1.    BZA Quorum, Recusal/Vacancy, and Voting Rules

81.    The BZA is made up of five members and six associate members. Five members and/or associate members must be present for a hearing to form a quorum, unless a petitioner agrees to a four-person quorum where unanimity is required. *See* City of Cambridge, Board of Zoning Appeal, Rules of Practice and Procedure § 4.1(b) (amended 2012). "Every decision of the Board of Zoning Appeal shall be by resolution adopted by the affirmative vote of at least four members of the Board." Cambridge, Mass., Zoning Ordinance § 10.17.

82.    If any member must be recused for "personal interest or absence," the Chairman of the Board must designate one associate member to replace that member. *Id.* § 10.11. "Members are expected to attend all Public Hearings of the Board. Associate members are expected to attend Public Hearings if designated by the Chairperson to sit and vote in the place of any Member who is absent or otherwise unable to sit and vote on a specific matter." City of Cambridge, Board of Zoning Appeal, Rules of Practice and Procedure § 4.1(a).

83.     When any member or associate member of the BZA disqualifies himself or herself from a vote due to personal interest, "the Chairperson shall state the fact of disqualification for the record." *Id.* at 4.2(a).

**2.      Chairman Monteverde and Ms. Agate Hijack The May 9, 2024 BZA General Hearing To Place Ms. Agate on Chabad's Panel**

84.     Defendants' scheme was put into action at the May 9, 2024 BZA General Hearing. The hearing began with the BZA's five primary members—Chairman Monteverde, William Boehm (Vice Chair), Steven Ng, Virginia Keesler, and Daniel Hidalgo—sitting for the session. However, Mr. Boehm was only present to vote on the first case, which he explained was his "only continued case tonight." As such, after the first case, associate member Mr. Miller announced he would be replacing Mr. Boehm. Ex. B (May 9, 2024 BZA Hearing Transcript) at 16:7-16:9.

85.     The hearing then took an odd turn. Ms. Agate, also an associate member, announced her presence and explained that she came "just for the last case," with the BZA's presiding clerk clarifying that "Carol's only on Banks Street," *i.e.*, Chabad's application. *Id.* at 16:15-22. In other words, Mr. Miller would be replacing Mr. Boehm for every case that hearing *with the sole exception of Chabad's case*, which Ms. Agate would sit for in Miller's stead. Chairman Monteverde immediately assented. *Id.* at 17:1 ("Okay, that's fine"). Mr. Miller did not explain why he was able to sit for every single case that night besides Chabad's. Chairman Monteverde was also required to but did not state the reasons for Mr. Miller's recusal on the record pursuant to BZA rules. *See* City of Cambridge, Board of Zoning Appeal, Rules of Practice and Procedure § 4.2(a) (amended 2012) (When any member or associate

member of the BZA disqualifies himself or herself from a vote due to personal interest, "the Chairperson shall state the fact of disqualification for the record.").

86.    Upon information and belief, the reason for this highly irregular process was to place Ms. Agate—who Chairman Monteverde knew was opposed to the Chabad proposal—in a position to vote on the proposal and ensure that the Chairman had the requisite votes for denial.

87.    Further, in violation of the BZA's Rules of Practice and Procedures, Chairman Monteverde did not state at the meeting that associate member Ms. Agate was designated to vote in place of Mr. Boehm or Mr. Miller rather than any other associate; she was merely slotted in. Ms. Agate appeared at the meeting, without explanation, and proceeded to vote on the matters as if she were a regular member of the BZA who did not require designation.

88.    With the panel hearing Chabad's application now fixed in place and Defendants perfectly positioned for denial, Chairman Monteverde, Steven Ng, Virginia Keesler, Daniel Hidalgo and Carol Agate all voted to continue Chabad's application to a final hearing on June 20 2024. *See* Ex. B (May 9, 2024 BZA Hearing Transcript) at 156:8-157:17.

## G. BZA Denies Permit; BZA Members Express Discriminatory Bias Against Chabad

89.    Ultimately, three members voted in favor of Chabad's application for a variance, while Chairman Monteverde and Ms. Agate voted against. Chairman

Monteverde and Ms. Agate not only voted "no" in lockstep, the little explanation they provided for their position revealed a clear discriminatory bias against Chabad.

### 1.  May 9 Hearing

90.    At the May 9 hearing, Ms. Agate insinuated that Chabad's growth was detrimental to the neighborhood stating that, "when there is more space, there are going to be more people. And more people is going to change the nature of the neighborhood." *Id.* at 148:17-148:21. The language employed by Ms. Agate, expressing concern for a "change" in the "character" or "nature" of a neighborhood, is typical coded language for "your kind are not wanted here."[12]

91.    Ms. Agate also erroneously accused Chabad of noncompliance with Historic Commission rules based on what she represented as a neighbor's complaint. When asked to clarify, Ms. Agate conceded that the source was neither a neighbor nor an authority on the matter. *Id.* at 47:22-48:10, 50:16-51:11.

92.    Chairman Monteverde also questioned the standard language in Chabad's approval from the Historic Commission. *Id.* at 64:9-65:10. The Historic Commission's approval letter stated that it had "determined that the existing buildings are not preferably preserved in the context of the proposed project design . . . titled, 'Harvard Chabad Center for Jewish Life 38, 48, 54 Banks Street Cambridge, MA,'" and that "[a] demolition delay was not imposed." Ex. Z - March 8, 2024 Historic

---

[12] *See e.g.,* The Word "Character," *Desegrate Connecticut,* https://www.desegregatect.org/character, ("Local zoning codes sometimes have loose definitions of the term "character," or do not define it at all. This term has been an avenue for discrimination against newcomers."); How Discussions of 'Neighborhood Character' Reinforce Structural Racism, *Twin Cities PBS* https://www.tpt.org/post/discussions-neighborhood-character-reinforce-structural-racism/.

Commission Letter. Upon information and belief, this is the standard language that the Historic Commission uses to approve applications pursuant to the Demolition Delay Ordinance, Ch. 2.78, Article II of the City Code. However, the Chairman stated he will "agree to disagree" whether the language constituted a valid approval. Ex. B (May 9, 2024 BZA Hearing Transcript) at 66:14-66:15. Chabad had to obtain an additional letter from the Historic Commission clarifying the approval for the June 20 hearing. *See* Ex. AA (June 11 2024 Historic Commission Letter).

93.     After Chabad's presentation, Chairman Monteverde opened the meeting up to public comment noting that the Board received over 60 correspondences supporting Chabad's project. Ex. B (May 9, 2024 BZA Hearing Transcript) at 67:3. Chairman Monteverde made clear that he did not want to hear from Chabad's 60 plus supporters saying "[s]o I'm not going to read those [letters of support]. I hope those folks please don't step up [laughter] for the 60 of them to repeat how much in favor they are and why." *Id.* 67:15-67:19 (third alteration in original).

94.     Attorney Adam Sherwin, presenting on behalf of KCNA, misstated federal law claiming the BZA need not consider Chabad's rights under RLUIPA since only a federal court could decide whether a denial of the permit amounted to a RLIUPA violation, and stated that Chabad was "not entitled to additional protection," beyond being heard at the hearing. *Id.* at 104:17-106:18. This same argument was then espoused by Ms. Agate at the beginning of the June 20 hearing. Ex. D (June 20, 2024 BZA Hearing Transcript) at 23:20-24:3.

95.     After comments, Chairman Monteverde's revealed his derogatory views of Chabad stating, "I think that is -- personal I feel that is a detriment to the neighborhood." Ex. B (May 9, 2024 BZA Hearing Transcript) at 137:7-138:3.

### 2.  **Ms. Agate and Mr. Boehm's anti-Chabad bias**

96.     A few hours before the June 20 hearing, Ms. Agate exchanged emails with BZA member Bill Boehm, revealing their inappropriate bias and prejudice.

97.     First, Mr. Boehm asked Ms. Agate if she would be able to cover for him on the new cases that night since he was participating remotely and may have bad internet connection. Ex. AB (June 20, 2024 Email from B. Boehm to C. Agate re June 20 Hearing) at 1.

98.     Ms. Agate then wrote back complaining about Chabad's application and indicating that she had no intent of giving it a full and fair hearing: "I do hope Chabad doesn't keep us there for hours before we even get to the regular calendar." Ex. AC (June 20, 2024 Email from B. Boehm to C. Agate Forwarding Link for June 20 Hearing) at 3. Ms. Agate could not be bothered with Chabad's positions.

99.     Mr. Boehm responded by inappropriately referring to the religion of one the panel members on the historic commission who voted against Chabad's application: "I'm planning on listening in on Chabad - interesting case..... I have a friend on the historic commission (which approved this). She was the only Jewish person on the panel and one of only two that did NOT approve!" *Id.* Mr. Boehm's email incorrectly suggests that it would be acceptable to vote against Chabad's application if the board member happens to be Jewish.

100.    Ms. Agate responded that: "[a] third one abstained. So they got approval by the skin of their teeth." *Id.* Again, these comments reveal Ms. Agate's disdain for Chabad and her prejudgment of its application. The subtext is disappointment in Chabad barely winning. It dispels any notion that she approached the June 20 hearing with an open mind.

### 3.  June 20 Hearing

101.    At the June 20 hearing, Chabad began by rebutting KCNA's erroneous assertion that Chabad's proposal would lead to almost 900 congregants attending Chabad services. *See infra* ¶ 71, 73. Chabad's architect explained that KCNA's estimation assumed full capacity of the sanctuary and dining hall *simultaneously*. In practice, however, the sanctuary and dining hall would never be occupied at the same time with meals served only *after* the conclusion of prayer services. Ex. D (June 20, 2024 BZA Hearing Transcript) at 20:2-21:18.

102.    Having clearly read Chabad's special memorandum on RLUIPA and the Cambridge Law Department's guidance, the board members then discussed the BZA's obligations under RLUIPA.

103.    Chairman Monteverde explained that in his view "RLUIPA or whatever you want to call it" only required the BZA to state on the record what it views as a compelling government interest in denying Chabad's application stating "I think all that means is we have to elaborate on what it is that's our concern; the reason why we would not accept it." *Id.* at 9:8, 24:15-25:15.

104.   Ms. Agate flagrantly declined to even consider Chabad's rights under RULIPA, stating "whether or not RLUIPA applies here would have to be a decision of a court that this isn't the kind of thing we are equipped to deal with," and "I would not think that [RLUIPA] would be an element of the hearing today." *Id.* at 23:16-24:14.

105.   Ms. Agate further misrepresented that the BZA would essentially have to take Chabad's word on what RLUIPA requires because it was the only analysis that was before the BZA. *Id.* at 25:20-25:21. This was false. As mentioned above in ¶ 78, the Cambridge Law Department had prepared and submitted a seven page legal analysis of the BZA's obligations under RLUIPA prior to the hearing, which, upon information and belief, Ms. Agate disregarded. Further, by denying she received the advice of counsel, Ms. Agate voluntarily put the nature of that advice at issue, waiving the City's ability to continue withholding its contents.

106.   Shockingly, Ms. Agate stated that the BZA could ignore the abundant precedent that Chabad had cited in its special memorandum because, "[w]e're not equipped to study the cases," *id.* at 25:21-25:22, insinuating, bizarrely, that ignorance exempts the BZA from complying with federal law. Ms. Agate should have known better. Upon information and belief, Ms. Agate was a practicing attorney for almost half a century and even served as an administrative law judge.

107.   Local zoning authorities are subject to federal law and must consider those rights in adjudications. *See W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 862 F. Supp. 538, 543 (D.D.C. 1994) ("The actions of the District of Columbia's

administrative body has denied the plaintiffs this right. What makes the District of Columbia's action particularly troubling is that in denying the plaintiffs the right to feed the city's homeless, *it has done so without ever considering the plaintiffs' constitutionally and legislatively protected rights*. The zoning administrator and the BZA have stated they have no jurisdiction to consider the plaintiffs' federally protected rights.") (emphasis added).

108.  RLUIPA prohibits local governments from implementing land use regulations that "imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution," unless the government carries its burden to show the regulation furthers a compelling governmental interest and is the least restrictive means of doing so. 42 U.S.C. § 2000cc(a)(1).

109.  Congress' legislative intent in passing RLUIPA was to forestall this exact scenario, local land use authorities neglecting to consider a religious entity's civil rights. As Senators Ted Kennedy and Orrin Hatch observed: "sometimes, zoning board members or neighborhood residents explicitly offer race or religion as the reason to exclude a proposed church, especially in cases of black churches and Jewish shuls and synagogues. More often, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan.'" 146 Cong. Rec. S7774–01 (daily ed. July 27, 2000) (Joint Statement of Sen. Orrin Hatch and Sen. Edward Kennedy).

110.  Ms. Agate's arguments were also strikingly similar to the false arguments espoused by attorneys for the KCNA. *See* ¶ 94.

111.   Ms. Agate questioned the information presented as to the number of religious institutions in Cambridge provided by the City Assessor's database, asserting that by her count there were at least three "Jewish ones" in the City of Cambridge. Ex. D (June 20, 2024 BZA Hearing Transcript) at 24:8-24:9. Ignoring the rich diversity of beliefs and practices in the Jewish community generally, Ms. Agate suggested that simply any Jewish institution should suffice for any Jew, and therefore that Chabad's overflow crowds, despite clearly preferring to worship at Chabad, could just go elsewhere regardless of their beliefs and particular practices. Ms. Agate also mentioned Beth El Temple, a Reform synagogue in Belmont, over an hour walk from Cambridge, as a suitable option for any of Chabad's congregants, many of whom do not drive on Shabbat and the holidays. *Id.* at 33:7-33:17. Chairman Monteverde cut off Rabbi Zarchi's attempts to address Ms. Agate's insulting and uninformed comments. *Id.* at 26:8-26:16.

112.   Notably, ***a majority*** of the BZA members heeded the advice of Chabad and, upon information and belief, the Cambridge Law Department and spoke out in favor of Chabad's application, correctly recognizing RLUIPA's protection and the substantial burden the BZA would be putting on Chabad's religious exercise by denying its application.

113.   BZA Member Steven Ng, an experienced architect, recognized the imperative to support "a place of worship that is currently serving their community outdoors with no security." *Id.* at 86:6-86:9. Mr. Ng correctly acknowledged that RLUIPA is there "to protect these groups from when they have to turn people away,

or if he's not able to host his congregants indoors or have to cancel an event because of restricted zoning." *Id.* at 86:19-87:9. Mr. Ng agreed with Chabad's counsel that the neighborhood "churches . . . footprints [are] . . . what they need to be serve their community," and that having to conduct services outside without security certainly constitutes a hardship. *Id.* at 87:12-88:2. Finally, Mr. Ng raised the harrowing possibility that "something happens because . . . you're worried about something just being about the same height as everything around in the neighborhood." *Id.* at 88:3-88:6.

114.    BZA Member Virginia Kessler supported Chabad's proposal, agreeing with Mr. Ng "in terms of the substantial burden that is imposed on the petitioner and the Jewish community" and because the proposed "FAR [was] not totally out of line with the neighborhood." *Id.* at 89:3-89:8, 89:13-89:19.

115.    BZA Member Daniel Hidalgo, an associate professor of Political Science at MIT, disagreed that the BZA "can't take into account federal regulations" and argued that the BZA should consider RLUIPA criteria as a court would. *Id.* at 90:10-91:3. Mr. Hidalgo recognized the obvious implications of Chairman Monteverde and Ms. Agate's head-in-the-sand approach, stating "if it did go to the court, then [the court] would -- you know, apply the criteria." *Id.* at 90:21-90:22. On one such criteria, Mr. Hidalgo said that "frankly, [he was] really struggling to find any compelling government interest" in denying the application. *Id.* at 91:4-91:5. While recognizing that some neighbors had concerns, Mr. Hidalgo argued that those concerns did not "rise to the point that would, you know, override the interests of a religious

community that deserves special protection." *Id.* at 91:4-91:8. Mr. Hidalgo also recognized Chabad's substantial community support and important mission, noting that "given the big community of congregants that support this, I think this would be an asset for the community at large. And I would be fine voting for it." *Id.* at 91:15-91:18.

116.    After voting down Chabad's application, Chairman Monteverde stated that he and Ms. Agate opposed the application based on Cambridge Zoning Ordinance Article 1.30 which states that the purpose of the zoning laws is "the protection of residential neighbors from incompatible activities." *Id.* at 93:9-94:9. Chairman Monteverde stated that in his view "the increased mass and therefore FAR is really incompatible with that neighborhood." *Id.*

**H. Defendants Withhold Information, Stymy Public Records Request**

117.    On June 21, 2024, Chabad's attorneys submitted a request to the City of Cambridge (the "City") under the Massachusetts Public Records Law (M.G.L. Chapter 66, Section 10) seeking, amongst other things, communications between BZA members about Chabad's application, communications between BZA members and KCNA members regarding Chabad's application, and information regarding the composition of the BZA panel that reviewed Chabad's application.

118.    Despite providing clear and particularized requests, the City refused to provide Chabad with the vast majority of the documents they had requested.

119.    The City provided unpersuasive excuses for denying Chabad's requests. For example, the City claimed that it could not respond to a request for "all records"

relating to particular events without clarification as to the specific types of records. While some requests were expressly limited to BZA employees, the City claimed that it could not respond to those requests because the requests lacked the names or departments involved that may possess responsive records, and the email addresses of those external to the City who might have been involved in any discussions or communications.

120.    In response to a request for information about Carol Agate's participation at Chabad's hearing, the City responded that the request did not identify Ms. Agate's email address, or her connection to the records.

121.    Chabad submitted a follow-up request for records on July 10, 2024.

122.    On July 24, 2024, the City responded that it would take them 25 business days, until August 29, 2024, to respond to Chabad's follow up request, and that it would ask BZA members and staff to manually preform searches of their email accounts for responsive communications.

123.    The City did not respond by the 25 day deadline, but delayed an additional ten business days, sending the documents responsive to Chabad's request on September 13, 2024.

**I.   BZA Approves Comparable Mosque Petition at July 11, 2024 Hearing.**

124.    On July 11, 2024, the BZA held a hearing (the "Mosque Hearing") on [Al-Amin Mosque's] (the "Mosque") requested zoning variances.

125.    Similar to the Chabad, the Mosque requested the BZA grant them variances to build a third story, combine two units, expand the building footprint, and add minarets and a dome to make the building appear more like a mosque.

126.    While the BZA claimed that Chabad was not substantially burdened by having to host its services and meals in the winter in Cambridge, the BZA determined that the Mosque's inability to have its entire congregation face eastward towards the Ka'bah in Mecca met the substantial burden test. *See* Ex. AE (July 11, 2024 BZA Hearing Transcript)

127.    The Mosque also claimed that it needed the third floor addition "for overflow space for congregants during religious festivals." *See* Ex. AD (Mosque BZA Application Form) at 4.

128.    The Mosque, like Chabad, had ample support from its community for its building project, which Monteverde emphasized during the hearing. *See* Ex. AE (July 11, 2024 BZA Hearing Transcript).

129.    While the BZA agonized during Chabad's hearing about whether the proposed building would change the "character of the neighborhood," the BZA unquestioningly accepted the Mosque's argument that the proposed minarets and dome were required by Islam and so the BZA was required to accommodate the variance despite the effect on the building's exteriors. *See Id.*

130.    Similar to Chabad, the Mosque is one of the few places of worship for Muslims in the area, and the Mosque explained in the Mosque Hearing that it serves not just the Cambridge Islamic community, but the Boston community at-large. *See Id.*

131.    While Chabad faced intense scrutiny over its plans to add additional floors and square footage, the BZA readily accepted the Mosque's requests.

132.   Moreover, the BZA stated in the June 20th Chabad hearing that it was not "equipped to deal with" laws relating to the intersection between zoning variances and religious practice. Yet the BZA addressed this very issue with respect to the Mosque's permit, discussing the potential application of the Dover Amendment, which concerns zoning and religion. *See* Mass. Gen. Laws ch. 40A, § 3.

133.   Both the Mosque and Chabad asked for similar requests: increased square footage, additional floors, and combined units, but one group was treated with disdain for its requested accommodations while the other experienced little concern or resistance. *See* Exs. D, AE (June 20, 2024 BZA Hearing Transcript and July 11, 2024 BZA Hearing Transcript).

134.   Further, while the BZA expressed concerns to Chabad about the proposed building's setback and congruity with the neighborhood, the Mosque received no such concerns or critique from the BZA when it requested the dome and minarets due to its respective religious practice. *See Id.*

135.   On its face, it appears that the Mosque received more favorable treatment and accommodation than Chabad given the similar requests but dissimilar outcomes.

## CAUSES OF ACTION

### COUNT I
**VIOLATION OF RLUIPA (42 U.S.C. § 2000cc(a)(1)) – Substantial Burden**

136.   Chabad re-alleges and incorporates by reference paragraphs 1 through 135 as if fully set forth herein.

137.   RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution--(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1).

138.   The BZA is a "government" under RLUIPA, because it is a "branch, department, agency, instrumentality, or official of" a "State, county, municipality, or other governmental entity created under the authority of a State." 42 U.S.C § 2000cc–5(4). Chabad is a "religious assembly or institution" under RLUIPA. 42 U.S.C § 2000cc(a)(1).

139.   By denying Chabad's application, and by abusing administrative processes, Defendants have implemented a land use regulation in a way that imposes a "substantial burden" on Chabad's religious exercise.

140.   Chabad's religious exercise is substantially burdened because it cannot serve its religious mission without the zoning variance. Chabad does not have sufficient space or a fully-functioning religious center, and it must host services and dinners outside under tents. This impedes the religious practice, forces Chabad to expedite services, and dissuades some congregants from attending altogether. Numerous residents and congregants have written letters and spoken at hearings explaining how their religious practice and Chabad's have been burdened.

141.   The imposition of that substantial burden is not in furtherance of any compelling governmental interest and, even if it were, it is not the least restrictive means of furthering such an interest, in violation of RLUIPA.

## <u>COUNT II</u>
## VIOLATION OF RLUIPA (42 U.S.C. § 2000cc(b)(1)) – Equal Terms

142.   Chabad re-alleges and incorporates by reference paragraphs 1 through 141 as if fully set forth herein.

143.   RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(l).

144.   The BZA is a "government" under RLUIPA, because it is a "branch, department, agency, instrumentality, or official of" a "State, county, municipality, or other governmental entity created under the authority of a State." 42 U.S.C § 2000cc–5(4). Chabad is a "religious assembly or institution" under RLUIPA. 42 U.S.C § 2000cc(a)(1).

145.   By denying Chabad's application, notwithstanding their grants to other non-religious landowners, Defendants have implemented a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with nonreligious institutions in violation of RLUIPA.

146.   The BZA routinely grants FAR variances to residential and commercial applicants. *See supra* ¶¶ 30-33, 58, 124-135.

## COUNT III
## VIOLATION OF RLUIPA (42 U.S.C. § 2000cc(b)(1)) – Nondiscrimination

147.   Chabad re-alleges and incorporates by reference paragraphs 1 through 146 as if fully set forth herein.

148.   RLUIPA provides that "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2).

149.   The BZA is a "government" under RLUIPA, because it is a "branch, department, agency, instrumentality, or official of" a "State, county, municipality, or other governmental entity created under the authority of a State." 42 U.S.C § 2000cc–5(4). Chabad is a "religious assembly or institution" under RLUIPA. 42 U.S.C § 2000cc(a)(1).

150.   Religious institutions in Cambridge are often located in residential districts and "almost always exceed the maximum FAR for those districts." *See supra* ¶ 58.

151.   Most of these properties are owned by Christian or Catholic organizations, whereas relatively few are owned by non-Christian/non-Catholic organizations and very few are owned by Jewish organizations.

152.   For example, within a mile of Chabad's proposed expansion there are four churches sharing the same applicable zoning district as Chabad (C-1) that all exceed the max FAR by 115-146%. *See* Ex. A (June 20, 2024, 38-40, 54-56 Banks Street Letter); Ex. C (FAR Chart – Churches). Similarly, within two miles of Chabad's site there are another four churches in a C-1 zone all exceeding the max FAR by 63-

121%. Ex. A (June 20, 2024, 38-40, 54-56 Banks Street Letter); Ex. C (FAR Chart – Churches).

153.    Another example of the BZA's discriminatory treatment of Chabad, shortly after denying Chabad's petition, the BZA readily approved a comparable petition submitted by a mosque.

154.    Like Chabad, the mosque requested increased square footage, additional floors, and combined units. Like Chabad, the mosque justified its variance request as necessary to facilitate its religious practice. But unlike Chabad, the BZA accepted the mosque's contentions and swiftly approved its petition.

155.    By denying Chabad's application—notwithstanding the numerous other churches and religious institutions located in similar residential districts throughout the City of Cambridge that have FARs that are similar to or in excess to that proposed by Chabad—Defendants have implemented a land use regulation in a manner that discriminates against Chabad on the basis of religion or religious denomination, in violation of RLUIPA.

### <u>COUNT IV</u>
### VIOLATION OF RLUIPA (42 U.S.C. § 2000cc(b)(1)) – Exclusion and Limits

156.    Chabad re-alleges and incorporates by reference paragraphs 1 through 155 as if fully set forth herein.

157.    RLUIPA provides that "[n]o government shall impose or implement a land use regulation that--(A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc(b)(3).

158.   The BZA is a "government" under RLUIPA, because it is a "branch, department, agency, instrumentality, or official of" a "State, county, municipality, or other governmental entity created under the authority of a State." 42 U.S.C § 2000cc–5(4). Chabad is a "religious assembly or institution" under RLUIPA. 42 U.S.C § 2000cc(a)(1).

159.   There is a noticeable dearth of synagogues and other Jewish institutions in the Cambridge area.

160.   Therefore, by denying Chabad's zoning application, Defendants have implemented a land use regulation in a manner that excludes and/or unreasonably limits religious assemblies from a jurisdiction, in violation of RLUIPA.

## COUNT V
## VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

161.   Chabad re-alleges and incorporates by reference paragraphs 1 through 160 as if fully set forth herein.

162.   Under 42 U.S.C. §1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

163.   Defendants and the BZA members act under color of state law, and are subject to 42 U.S.C. § 1983. Defendants have deprived Chabad of its rights secured by the U.S. Constitution.

164.   The First and Fourteenth Amendments to the United States Constitution prohibit Defendants from depriving Plaintiff of its right to freely exercise its religion, from doing so without due process of law, and from denying Plaintiff the equal protection of the laws.

165.   The Supreme Court has interpreted the Free Exercise Clause to mean that the government may not enact non-neutral and non-generally applicable laws or policies that substantially burden a sincerely held religious belief unless they are narrowly tailored to a compelling government interest. Such laws are narrowly tailored only if they are the least restrictive means of achieving the asserted compelling interest. *Carson v. Makin*, 596 U.S. 767, 780-83 (2022).

166.   The Supreme Court has held that "government regulations are not neutral and generally applicable . . . whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphasis in original). Moreover, any state action that discriminates on the basis of religion or targets religion for specially disfavored treatment is subject to strict scrutiny and must be invalidated unless it is "justified by a compelling interest and is narrowly tailored to advance that interest." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

167.   A facially neutral law violates the Free Exercise Clause if it is used to target religious conduct for distinctive treatment. The Supreme Court has held that local restrictions violated a "minimum requirement of neutrality" by specifically naming religious entities for restrictions while allowing secular businesses

categorized as "essential"; accordingly, "the regulations cannot be viewed as neutral because they single out houses of worship for especially harsh treatment." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16-17 (2020) (per curiam) (citation omitted).

168.    The U.S. Supreme Court has held that 42 U.S.C. § 1983 does not "require [the] complete separation of church and state; *it affirmatively mandates accommodation*, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984) (emphasis added).

169.    By denying Chabad's zoning application, and by abusing the administrative process to do so, Defendants violated the First and Fourteenth Amendments.

170.    Defendants and the two BZA members subjected Chabad to an unfair process that has prevented it from starting renovations to provide Jews religious services and thus have prevented Chabad and its congregants from freely practicing Judaism.

171.    Without permission to build as proposed, Chabad will not be able to conduct services and adequately provide for the religious needs of its congregants, which plainly constitutes a "substantial burden" on Chabad's religious mission. *See Vision Warriors Church, Inc. v. Cherokee Cnty. Bd. of Comm'rs*, No. 22-10773, 2024 WL 125969, at *8 (11th Cir. Jan. 11, 2024) (citation omitted) (an organization's "religious exercise need not be completely hamstrung to meet the substantial burden threshold.").

172.   Defendants' actions are not neutral or generally applicable because Defendants do not impose similar obstacles and hindrances upon other religious institutions in similarly zoned districts. Further, Defendants' actions are not neutral or generally applicable because they treated Chabad unfairly during the administrative process, with the intent to deny its application based on anti-religious reasons and not neutral, objective reasons.

173.   Defendants do not have a compelling interest in preventing Chabad from having a hearing with Defendants or to proceed with the building plans. Defendants' conduct hindering and delaying Chabad's application shows only a lack of tolerance and accommodation.

174.   Even assuming Defendants had some compelling government interest, Defendants have not applied the least restrictive means of achieving that interest.

175.   As a direct and proximate result of Defendants' conduct, Chabad has suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, damages, and attorneys' fees.

## COUNT VI
## VIOLATION OF ARTICLE 2 OF THE DECLARATION OF RIGHTS OF THE MASS. CONSTITUTION

176.   Chabad re-alleges and incorporates by reference paragraphs 1 through 175 as if fully set forth herein.

177.   Article 2 of the Declaration of Rights of the Massachusetts Constitution provides that: "No subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping GOD in the manner and season most agreeable to the

dictates of his own conscience; or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship." Mass. Const., pt. I, art. II.

178.    In *Society of Jesus of New England v. Boston Landmarks Commission*, 409 Mass. 38 (1990), the Supreme Judicial Court of Massachusetts found that the Landmarks Commission's designation of the interior of a Jesuit church unconstitutionally restrained religious worship. The Court noted that Article 2 "plainly contemplates broad protection for religious worship." *Id.* at 41.

179.    Except for the enumerated exceptions, rights under Article 2 are absolute. *See Soc'y of Jesus of New Eng. v. Commonwealth*, 441 Mass. 662, 676 (2004). Under the worship prong of Article 2, "one is free to 'worship[ ]' in any form, as long as that form of 'worship[ ]' does not disturb the peace or obstruct the worship of others." *Id.* at 677 (alterations in original).

180.    Defendants violated Chabad's rights under Article 2 by inhibiting it and its congregants from worshipping in the manner and season most agreeable to them. That manner would be the ability to worship through ritual meals, services and the like in a fully-functioning religious center within walking distance from their residences.

181.    Chabad's proposed building structure and its worship activities taking place therein would not disturb the peace as no laws would be broken through Chabad's actions. Chabad's proposed unified building structure and its worship

activities taking place therein would not obstruct the worship of others as members of all other faiths would be free to continue their existing religious practices.

## COUNT VII
## VIOLATION OF MASS. CIVIL RIGHTS ACT, MASS. GEN. LAWS C. 12, § 11

182.   Chabad re-alleges and incorporates by reference paragraphs 1 through 181 as if fully set forth herein.

183.   The Massachusetts Civil Right Act provides "[a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court." Mass. Gen. Laws Ann. ch. 12, § 11I.

184.   Section 11H of the same statute states "[w]henever any person or persons . . . attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured." Mass. Gen. Laws Ann. ch. 12, § 11H.

185.   "The MCRA is coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not, and the derogation of secured rights must occur by threats, intimidation, or coercion." *Sietins v. Joseph*, 238 F. Supp. 2d 366, 377-78 (D. Mass. 2003) (internal quotation marks and citations omitted); *Nolan v. CN8*, 656 F.3d 71, 76 (1st Cir. 2011); *Diaz v. Devlin*, 229 F. Supp. 3d 101, 112 (D. Mass. 2017).

186.   Further "[n]o discussion of the MCRA claims is required. Having determined that defendants are entitled to summary judgment on all of the federal § 1983 claims, it follows that they are entitled to summary judgment on the MCRA claims as well." *LeBaron v. Mass. P'ship for Corr. Healthcare*, No. 14-14138-LTS, 2017 WL 6767508, at *17 (D. Mass. Dec. 4, 2017).

187.   In violation of Section 11H of the Massachusetts Civil Right Act, Defendants have attempted to interfere with the free exercise of Chabad's sincerely held religious beliefs, secured by the Constitution of the United States.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff requests that the Court grant the following relief:

a.     Declare that the actions of Defendants, as alleged herein, were in violation of the First and Fourteenth Amendments to the U.S. Constitution, RLUIPA, Article 2 of the Declaration of Rights of the Massachusetts Constitution, and Massachusetts General Laws, c. 12 § 11

b.     Order Defendants to approve the zoning permit pertaining to Chabad's application for Banks Street in Cambridge, Massachusetts.

c.     Award compensatory and punitive damages against Defendants in favor of Chabad for the loss of its rights under the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, RLUIPA, the Massachusetts Constitution, and Massachusetts Civil Rights Laws.

d.     Award Chabad's attorneys' fees and disbursements in this action, under 42 U.S.C. § 1988(b).

e.     Award such additional relief as the interests of justice require.

September 20, 2024                           Respectfully Submitted,
Boston, Massachusetts


*/s/ Rebecca Sivitz*_____

Yehudah L. Buchweitz (*pro hac vice application forthcoming*)
Rebecca Sivitz (BBO # 684347)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Yehudah.Buchweitz@weil.com
Rebecca.Sivitz@weil.com